1
2
3
4
5
6
7
8

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Guy Stern, | No. CV-06-00016-TUC-DCB (JR) |
| Petitioner, | **REPORT & RECOMMENDATION** |
| v. | |
| Dora B Schriro, et al., | |
| Respondents. | |

Pending before the Court are Petitioner Joseph G. Stern, Sr.'s Petition for Writ of Habeas Corpus [Docket No. 1] filed under 28 U.S.C. § 2254.  In accordance with the Rules of Practice of the United States District Court for the District of Arizona and 28 U.S.C. § 636(b)(1), by order dated August 19, 2015 (Doc. 197), this matter was referred to the Magistrate Judge for report and recommendation.  As explained below, the Magistrate Judge recommends that the District Court, after an independent review of the record, dismiss the Petition with prejudice.

## I.      Procedural Background

Petitioner is a state prisoner serving a life sentence following his conviction on two counts of child abuse and one count of felony murder arising from the death of a two year-old girl.  In an order filed on January 24, 2007, District Judge Bury found

Petitioner's federal habeas Petition barred by the AEDPA statute of limitations, 28 U.S.C. § 2244(d)(1), and procedurally defaulted under 28 U.S.C. § 2254(b).  The District Court concluded, however, that Petitioner could avoid dismissal if he could "demonstrate evidence of actual innocence sufficient to bring him within the narrow class of cases implicating a fundamental miscarriage of justice . . . ."  (Doc. 33, p. 12).  Because the Respondent had not addressed Petitioner's gateway claim of actual innocence, the Court ordered that a response be filed.  (*Id*., p. 15).

On April 26, 2007, Respondents filed their Supplement Brief on Actual-Innocence Claim.  (Doc. 42).  On November 16, 2007, Petitioner filed his Supplemental Brief Re: Gateway Actual Innocence.  (Doc. 54).  The matter was then referred to Magistrate Judge Rateau (then Marshall) for Report and Recommendation.  (Doc. 61).  Petitioner then requested and was granted the opportunity to supplement his brief (Docs. 62, 63), and Respondents were also permitted to supplement their brief (Doc. 65).  The Magistrate Judge then set the matter for hearing on March 31, 2009.  (Doc. 68).  The hearing date was later vacated and the parties were permitted to conduct additional discovery.  (Doc. 76).

Respondents then sought reconsideration by the Court of its decision to conduct an evidentiary hearing, arguing such a hearing was unnecessary to the resolution of Petitioner's actual innocence claim.  (Doc. 94).  The motion for reconsideration was denied (Doc. 111), and the Magistrate Judge reset the hearing for June 28, 2010, and then to July 29, 2010 (Docs. 128, 140).  However, on July 6, 2010, the Ninth Circuit issued it opinion in *Lee v. Lampert*, 610 F.3d 1125 (9th Cir. 2010), holding that a petitioner's

actual innocence under the *Schlup* gateway exception does not excuse a petitioner's failure to timely file his habeas petition.  Based on that decision, the Magistrate Judge vacated the hearing and issued a Report and Recommendation recommending that the Petition be dismissed as untimely. (Doc. 149).  The District Court subsequently adopted the recommendation and dismissed the Petition as untimely.  (Doc. 157).

After the Petition was dismissed, Petitioner commenced a fourth PCR action in state court, challenging his convictions pursuant to Arizona Rule of Criminal Procedure 32.1(e)(1) based on newly discovered scientific evidence that "authoritatively concluded" that Shaken Baby Syndrome ("SBS") and thick-cushion Shaken Impact Syndrome ("SIS") could never cause Traumatic Brain Injury ("TBI"), but a Lethal Minor Fall ("LMF") could.  (Doc. 192, Ex. AA, pp. 2-3).  Petitioner was assigned counsel and a hearing was scheduled in state court.  (Doc. 192, Exs. AA, FF.)

Meanwhile, Stern appealed the District Court's decision denying his Petition based on the Ninth Circuit's *en banc* reversal of the three judge panel's decision in *Lee v. Lampert*, 610 F.3d 1125.  The *en banc* court held that a valid claim of actual innocence under *Schlup* can excuse an untimely filed habeas petition.  *See Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011).   Based on that ruling, the Ninth Circuit remanded this case to determine whether the untimeliness of the Petition "is excused based on his assertion of actual innocence due to newly discovered medical evidence invalidating the prosecution's theory of shaken baby syndrome or shaken impact syndrome."  (Doc. 175-1, pp. 1-2).  After remand, the matter was stayed pending the outcome of Petitioner's state PCR action.  (Doc. 177).

The state court evidentiary hearing commenced on May 21, 2012 and the trial court heard three days of testimony and argument.  (Doc. 192, Exs. CC, DD, EE).  After considering the pleadings, the original trial testimony and the testimony presented at the evidentiary hearing, the trial court issued a 12-page ruling denying the PCR petition.  (Doc. 192, Ex. AA).  The trial court summarized the basis for the denial as follows:

> Because the new expert testimony does not dispel the old expert testimony in this case, and more importantly, because the trial record shows the State presented credible and compelling non-medical evidence that shows Defendant intentionally injured [Katherine Rose] and tried to cover his crime, the Court finds that newly discovered evidence probably would not have changed the jury verdict.

(*Id.*, p. 11).  The Arizona Court of Appeals affirmed the trial court's ruling and the Arizona Supreme Court denied review.  (Doc. 192, Exs. HH, II).  Petitioner then successfully moved this Court to lift the previously entered stay of this case.

On April 14, 2014, the parties then filed a Joint Status Report "reflecting a consensus as to the proceedings that are necessary to resolve the matter before the Court."  (Doc. 187).  In that Report, the parties agreed that an evidentiary hearing was unnecessary in light of the state court evidentiary hearing and that Petitioner's actual-innocence gateway-exception claim would be suitable for resolution after supplemental briefing.  Based on the parties' agreement, the Court ordered supplemental briefing "regarding the newly discovered medical evidence and actual innocence claim."  (Doc. 188).

Based on the Court's order, Petitioner filed his Supplemental Memorandum (Doc. 189), Respondents filed their Response (Doc. 192), and Petitioner filed his Reply (Doc.

195).  On August 19, 2015, the case was referred to Magistrate Judge Rateau for Report and Recommendation.  (Doc. 197).  As explained below, the Magistrate Judge finds that Petitioner has not established his actual innocence and recommends that the Petition be denied.

## II.    Factual Background

### A.    Trial

In the beginning of September 1993, Defendant Stern's son, Joshua, moved from Wisconsin, where he lived with his mother, to Tucson to live with his father.  (Tr. 4:180).[1]  They lived in a trailer on Grant Road with Jeremy and Jackie, who were Defendant Stern's children and Joshua's half-siblings.  (Tr. 4:181).  Later, Defendant Fernane and her daughter Katherine Rose began staying in the trailer, as well.  (Tr. 4:183).  Toward the end of October 1993, they moved from the trailer to a two bedroom apartment.  (Tr. 4:183-84).

While living in the apartment, Joshua recalled that Katherine Rose had fallen off his bed, but appeared to be fine shortly thereafter.  (Tr. 4:194).  About one week later, on or about November 5, 1993, Joshua went into the living room and saw Katherine Rose unconscious and Defendant Stern was administering mouth-to mouth resuscitation.  (Tr. 4:198-99 & 230-32).  His father told Joshua to sprinkle some cold water on Katherine Rose's face, which he did, and Joshua asked what happened.  Defendant Stern told him

---

[1]  The transcripts of Petitioner's trial are attached to the Respondents' *Supplemental Brief on Actual Innocence Claim*, filed on April 26, 2007 (Doc. 42), and are identified as "Tr.," followed by the trial day and the transcript page number where the cited testimony appears.

- 5 -

that he had tossed Katherine Rose into a chair and she had passed out.  (Tr. 4:199-200).

After that incident, Joshua said Katherine Rose acted sick.  (Tr. 4:200).   Joshua also

testified that when Katherine Rose was with Defendant Stern, she would act "quiet." (Tr.

5:54).

On the Friday, when Petitioner's brother Lawrence Stern visited, Joshua was left

to care for all three kids.  (Tr. 4:202).  The next day, Saturday, Joshua remembers that

Katherine Rose was still acting "sick."  (*Id.*)  When she was outside playing, Katherine

Rose would just sit wherever Joshua set her down.  (Tr. 4:203).  That evening, Joshua

went out with his friends, and returned home between 11:00 p.m. and midnight to find

Katherine Rose asleep on the couch.  (Tr. 4:204-205).  The following morning, Joshua

woke-up at about 9:00 a.m.  Katherine Rose was in the living room "laying down falling

asleep." (Tr. 4:205).  At around 9:30 or 10:00 a.m., Joshua and Michelle Fernane went to

the grocery store.  (Tr. 4:206-207).  When they left, Defendant Stern was in a chair in the

living room and Katherine Rose was on the couch.  (Tr. 4:208).

When Joshua and Michelle returned from the store, Defendant Stern was on the

floor in front of the chair and he was again performing mouth-to-mouth resuscitation on

Katherine Rose.  (*Id.*)  Defendant Stern told Michelle to help him, which she did.  (Tr.

4:209).  Stern then went to get a wet rag and Joshua went to get the groceries from the

car.   (Tr. 4:209-210).   When he returned, both his father and Michelle were over

Katherine Rose taking turns performing mouth-to-mouth and moving her legs.  (Tr.

4:210).  Joshua said, "let's take her to the hospital," and Stern said "no."  (Tr. 4:211).

Fernane agreed when Stern said, "we'll all go down for this."  (Tr. 212).  For "[b]etween

one and two hours," Fernane and Stern continued to work on Katherine Rose.   (Tr. 4:213).   Joshua then told them that he was taking her to the hospital.   (*Id.*)   He then took her to the hospital with Fernane.   (*Id.*)   Stern arrived at the hospital sometime later.   (*Id.*)

Katherine Rose was seen in the emergency room at St. Joseph's Hospital by John Bush, M.D.   (Tr. 4:158).   Dr. Bush's opinion was that any delay in treatment did not affect the outcome because the damage was already irreversible.   (Tr. 4:166).   He determined that Katherine Rose had a "severe head injury" and was going to "require pediatric intensive care very quickly if she was going to survive."   (Tr. 4:168-69).   Dr. Bush suspected child abuse and directed a nurse to contact the Tucson Police Department.  (Tr. 4:167).

At approximately 3:00 p.m. on November 14, Katherine Rose was transferred from St. Joseph's Hospital to Tucson Medical Center and was seen by Andres Theodorou, M.D., a pediatric critical care physician.   (Tr. 5:85-86).   Upon examination, Dr. Theodorou found "large retinal hemorrhages," her right eye was fixed and dilated, suggesting swelling of the brain, and no spontaneous movement of the eyes.   (Tr. 5:88-89).   "There was a flexion of the upper extremities, and not as much movement of the lower extremities and both toes were upgoing."   (Tr. 5:89).   These findings indicated "severe brain injury already beginning to affect critical parts of the brain, affecting certain movements which tell us the brain injury is severe."   (*Id.*)

Various therapies were either instituted or continued and a CT scan was performed to determine if surgical intervention would be beneficial.   (Tr. 5:91).   The    CT scan revealed a loss of grey white matter, a small amount of subdural blood and the right brain

was beginning to swell.  (*Id.*)  Dr. Theodorou evaluated the history given to him and his physical examination findings, and concluded that Katherine Rose was "a battered child" and that her brain injury was "secondary to an inflicted trauma."  (Tr. 5:98).  The doctor explained that:

> [w]hen you have such severe brain injury, the literature tells us that to have this degree of brain injury, the trauma or the injury had to have been massive, like a car accident, falling from [a] third story building, had to be some sort of massive trauma.  So if this injury was to have occurred from a fall, I would also look for other types of injury, broken bones, something to that nature.

(Tr. 5:98).

When asked if Katherine Rose's injuries could have resulted from a fall from a two foot high couch or three foot high bed, Dr. Theodorou stated, "That's impossible based on all the literature we have. . . . [T]here are several articles [that] look at beds, couches, cribs, real popular area of research for pediatric and trauma investigators, and severe head injuries do not occur from those heights."  (Tr. 5:102).  He also explained that while retinal hemorrhages could be caused by aggressive CPR, it would be exceedingly rare and that he had never personally seen it occur.  (Tr. 5:103).  He also opined that Katherine Rose's injuries were caused by an acute event that was in the process of developing.  (Tr. 5:105).  Dr. Theodorou also explained that if there was no delay in treatment of Katherine Rose's brain injury, then the injury took its inevitable course and she died.  However, he indicated that if the brain injury trauma had occurred sometime before help was called, then a delay in intervention may have impacted the outcome.  (Tr. 5:111-113).  As it was, Katherine Rose was pronounced clinically dead at

11:58 a.m. and was taken of the respirator at 12:15 p.m., on November 15, 1993.   (Tr. 5:122 & 125).

Joshua Stern was interviewed by the police at the hospital and "told them what [Stern] told [him] to say" before they left for the hospital.  (Tr. 4:214).  Josh explained that Stern "said that we were going to tell them she – that she fell from the bed and got knocked out, and then we brought her into the hospital."  (Tr. 214-15).  On the Monday or Tuesday following the incident, Joshua was at a relative's house with Stern.  Stern told him, "we want to make up another statement" to avoid getting in trouble.  (Tr. 4:217-18).  He told Joshua to say that Stern and Joshua "were sleeping and Katherine and Michelle [Fernane] were the only ones up.  And she started screaming for help and me and him came out."  (Tr. 4:217).  Joshua stated that this story was made up "[s]o it can look like it goes on Michelle [Fernane]."  (Tr. 5:40).

On Wednesday, November 17, Joshua got on a bus to return to his Mother in Wisconsin.  (Tr. 4:216).  While sitting on the bus, the police came in and told him they wanted to question him.  (Tr. 4:220).  He went to the downtown police station where, represented by a lawyer, he gave a statement to police that was in line with the second version of events that his father told him to give.  (*Id.*).  Joshua then spent the night with Stern's brother, Lawrence, and went back to Wisconsin the next day.  Lawrence Stern testified that he heard Joseph Stern tell Joshua Stern that he should "stick to the story."  (Tr. 3:125).  Lawrence also noticed that Katherine Rose was lethargic on November 12, 1993, and testified that she "didn't move around a lot."  (Tr. 3:126).  Lawrence had also stated previously that Joseph had been rough with his kids.  (Tr. 3:146).

Norman Thiersch, M.D., the pathologist that examined Katherine Rose, found external injuries to her back, chest, right arm, head, and mouth. (Tr. 3:159-161). Internal injuries included the left side of her chest, neck and tongue. (Tr. 3:172-173). Dr. Thiersch opined that the injuries were the result of blunt force trauma. (Tr. 3:173-174). Dr. Thiersch also found evidence of injury to her brain and scalp. (Tr. 3:174). He found a subdural hemorrhage where the contusions and abrasions were found on her right forehead and on the top of her head, the most likely cause of which was blunt impact injury. (Tr. 3:175-177). He found evidence of bleeding on Katherine Rose's brain, which he associated with blunt impact or injuries to the head, and found retinal hemorrhaging, which is usually associated with injuries to the head. (Tr. 3:178-179). Iron testing of various injuries showed that some were more and some were less than 72 hours old at the time of the baby's death. (Tr. 3:184). Dr. Thiersch also found evidence of bronchopneumonia which he associated with the brain injury and the shut-down of Katherine Rose's gag reflex. (Tr. 3:186). Based on his examination, Dr. Thiersch concluded that she died "due to the subdural subarachnoid hemorrhage due to blunt impact to her head." (Tr. 3:187). He classified her death as a homicide and testified that "[w]ith the extent of injury to her brain and hemorrhage, someone with those kinds of and that amount of hemorrhages is not going to live very long," and thus concluded that a blow that had occurred within 72 hours of her death "probably contributed directly to her death." (Tr. 3:190).

Dr. Thiersch, when asked about "shaken impact syndrome or shaken baby syndrome" testified as follows:

Term shaken baby syndrome is something that's come up in the clinical literature to explain injuries that are found in children.  It refers to a young infant being shaken so that there is injury to the brain, subdural hemorrhage and associated hemorrhages, retinal hemorrhages, hemorrhage in the eyes.  That is something I'm – I don't necessarily ascribe to.  I think that often times in these children that have retinal hemorrhages and subdural hemorrhages that there is a component of impact, blunt impact.  The literature is beginning to reflect that in that it's called shaken impact.  A lot of that has to do with how the term developed and how autopsies were done, so that in previous years the impacts were missed because the scalp was not reflected, the impacts were not looked for.

(Tr. 3:192-193).   Dr. Thiersch then stated that he could "attribute all of her injuries to blunt impact without necessarily having the child shaken."   (Tr. 3:193).   He then described what he found as significant injury and opined that it would be unusual for such injury to result from a fall from a two and one-half foot high bed or chair onto a carpeted surface.  (Tr. 3:194).  On cross examination, Dr. Thiersch was questioned about the definitions of "shaken baby syndrome" and "shaken impact syndrome."  (Tr. 4:36).  He stated that:

"Shaken baby syndrome is something that has been described in the clinical literature of pediatricians where simply shaking up a child and the head flopping causes subdural hemorrhage and injuries to the brain and retinal hemorrhages. . . .  Shaken impact syndrome in addition to the shaking includes impact of the head with the solid object, some sort of blunt force trauma, that generates the forces that are necessary to cause the subdural hemorrhage and the injury to the brain.  There are those that think that shaken baby in and of itself just shaking a kid does not generate sufficient forces to cause injuries in the brain, subdural hemorrhage.

(Tr. 4:37).  He then reiterated that he believed that Katherine Rose's injuries were the result of impact, which may or may not have involved shaking.  (Tr. 4:37-38).

The neurosurgeon who examined Katherine Rose at the hospital, Kurt Schroeder, M.D., testified similarly regarding shaken baby syndrome:

[A]s one reads the literature of the years perhaps 10, 12, years ago, the thought was that the injuries resulted from shaking, grabbing the baby, shaking back and forth usually because baby wouldn't quiet, stop crying. Recent thought in the last couple years has shifted more than that, probably mechanism of injury is that not only does shaking take place, but that the child's head hit something, soft pillow, cushion, mattress in a crib, and essentially supplementation of shaken impact syndrome, shaken baby syndrome, nonaccidental trauma in a case with head injury that the child presents without any or very few external signs of trauma, it has a significant neurologic problem and signs of significant neurologic damage seen on CAT scan or MRI, and the additional information is that rarely does the history match the significant findings found on CT or MR.

(Tr. 3:205-206). Dr. Schroeder then stated that Katherine Rose's "injuries, neurologic status are extremely, extremely, unlikely due to the history as presented to me." (Tr. 3:206). When asked why he believed as he did, Dr. Schroeder said, "Significant injuries are caused by significant trauma. And that's the case. This is a significant neurologic devastation. It was not caused by insignificant trauma." (Tr. 3:206). Dr. Schroeder also said that the retinal hemorrhaging could only be caused by an acceleration/deceleration injury on the magnitude of an auto accident without a seat belt. (Tr. 3:208). Finally, he was asked if there was anything that he observed in his evaluation of Katherine Rose that would lead him to a diagnosis other than "non-accidental shaken impact injuries," and he responded "[n]ot from the information that I have at hand." (Tr. 3:209).

Dianne Kopplin, who was married to Defendant Stern from 1970 to 1979, and who lived with him at times until 1984, had five children with Stern. (Tr. 4:72-74). She reported that their son, Joshua, who was then about 16 years-old, went to live with Stern in Arizona in September 1993. (Tr. 4:79). Joshua was in Arizona when Katherine Rose died and Defendant Stern, after Ms. Kopplin requested that Joshua be sent home to her,

- 12 -

told her that Joshua was a suspect.  (Tr. 4:82-84).  Defendant Stern also told her how Katherine Rose died, and later changed the story and admitted he and Joshua had initially lied about how long the baby was unconscious before she was taken to the hospital.  (Tr. 4:85-86.)

Rose Marie Swilley, a neighbor who watched the kids, testified that she saw Stern shake, push, and throw water at, and put a towel in Katherine Rose's mouth, all the while telling Swilley to not say anything about it. (Tr. 2:126-127 & 136 (shaking)).  Swilley testified that this occurred "[j]ust about every day," and that Katherine Rose was "terrified of him." (2:127)

## B.   Testimony Presented In PCR Evidentiary Hearing

### 1.   Patrick Hannon, Ed.D.

Patrick Hannon, Ed.D., was retained by Petitioner to examine the biomechanics of SBS, SIS and lethal minor falls ("LMF")  as they relate to this case.  (Doc. 192, Ex. CC, pp. 13, 29).  Dr. Hannon agreed that the biomechanical science related to SBS, SIS and short-fall death in children had changed since the time of Petitioner's 1994 trial.  (*Id.*, pp. 14-15).

Dr. Hannon testified that death related to SBS can occur by shaking alone, but only in a young infant, and it always presents with cervical spine damage at least to the musculature and ligaments.  (*Id.*, pp. 59-60, 103).  As for SIS, Dr. Hannon indicated that the science has been refined but has not changed much.  (*Id.*, p. 60). He indicated that a hard strike can easily produce subdural hematoma, but noted that such an event will always be accompanied by external injury.   (*Id.*, pp. 60-61).  He stated that the scientific

evidence related to LMF "is relatively new."  (*Id.*, p. 61).  He noted two case studies that documented death resulting from a minor fall.  (*Id.*).

On cross-examination, Dr. Hannon indicated that he had not reviewed Dr. Theodorou's trial testimony.  (*Id.*, pp. 79-80).

### 2.    Peter Stephens, M.D.

Peter Stephens, M.D., is a board certified forensic pathologist. (*Id.*, p. 120).  Dr. Stephens testified that since Stern's 1994 conviction, and especially since 2000, "there have been drastic and constant changes in our understanding of infant head injury and the so-called shaken baby syndrome, which was, I understand, the basis of his conviction in 1994."  (*Id.*, pp. 125-126).  The doctor explained that additional research has "led to the conclusion that the previous criteria for making a diagnosis of shaken infant syndrome were incorrect and unscientific."  (*Id.*, p. 126).  The previous criteria used to diagnose shaking injuries, referred to as the "triad," was propounded in the 1970s and was based on the presence of brain swelling, subdural hematoma, and retinal hemorrhages.  (*Id.*, p. 133).   The doctor explained that, in the last five years, "it has become increasingly recognized that the triad is not a valid way of making this diagnosis."  (*Id.*).  The validity of the diagnosis was questioned because:

> there are many, many other conditions that can cause brain swelling.  There are many conditions that can cause subdural hematoma, both traumatic and non-traumatic.   And retinal hemorrhages are totally meaningless and irrelevant in this situation because they result from the brain swelling, and pretty much any condition that will give you brain swelling will also give you retinal hemorrhages.

(*Id.*, pp. 133-134).

- 14 -

Based on this change in science, and after reviewing numerous documents and the testimony related to this case, Dr. Stephens opined to a reasonable degree of medical certainty that Katherine Rose "died as a result of a short-distance fall from her bed onto a carpeted floor which resulted in the onset of global brain swelling and subdural hemorrhage." (*Id.*, pp. 126-127, 130-131, 139, 148-149, 155 (indicating "one or more accidental head impacts" that occurred three days to two weeks before her death), 160-161, *Id.*, Ex. DD, pp. 20-22). However, Dr. Stephens could not determine whether or not the injuries were intentionally inflicted. (*Id.*, Ex. DD, pp. 24-25). He also stated that "shaking action is not a satisfactory explanation for [Katherine Rose's] subdural hematoma. (*Id.*, p. 127). He explained that the evidence and history of head impacts indicates that a shaken baby hypothesis could not apply and additionally stated that shaken baby syndrome, if it can occur at all, will only be seen in children under one-year-old because by that age "just about every child has neck strength which can protect them against shaking injury . . . ." (*Id.*, p. 128).

Based on the presence of iron positivity, Dr. Stephens indicated that the subdural hematoma identified in the autopsy was greater than 72 hours old and he believed that Katherine Rose's injuries occurred from three days to two weeks before her death. (*Id.*, pp. 132-133). On this point, Dr. Stephens disagreed with the doctors involved in Katherine Rose's treatment on the timing of the injury. According to Stern's counsel, the doctors who testified at trial "adopted the theory that the injury had to have happened within a very, very short period of time of her admission to the hospital . . . ." (*Id.*, pp. 142-143). Dr. Stephens stated that he likely would have agreed with that theory in 1995,

but more recent study of 160 infant deaths disclosed that, although 75% of the children had developed symptoms within the 24 hours before being brought into the emergency room in critical condition, in most of the cases "there had been evidence of the child not being quite their normal self" for some time before admission.  (*Id.*).  Thus, the doctor explained, "there are many cases . . . on record that have led people to pretty much reject the theory that just because a head injury can kill you, that it's immediately symptomatic."  (*Id.*, p. 144).

In a related opinion, Dr. Stephens indicated that "without additional information I am very hard put to say that a delay in her treatment would have contributed [to her death]."  (*Id.*, pp. 144-145).  This is because brain injuries of this type "start off with swelling occurring very slowly," and although "swelling may occur within as little as 20 to 30 minutes of the injury" it "may take up to 72 hours, and we don't know in any given case which of those two events is happening"  (*Id.*).  Thus, he believes, "[i]t's almost impossible to say with certainty whether or not a delay in treatment did or did not have any effect."  (*Id.*, pp. 145-146, 161).

### 3.    Andreas Theodorou, M.D.

Andreas Theodorou, M.D., is a pediatric intensive care specialist, who treated Katherine Rose in November of 1993.  (*Id.*, Ex. EE, pp. 18-19).  Relying on his records, Dr. Theodorou described the presentation and treatment course.  (*Id.*, p. 19).  When he first saw Katherine Rose, she had been transferred from another hospital and was on the verge of death.  (*Id.*).  She was apneic and using a breathing tube, there was a difference in pupil size, and she had a low heart rate.  (*Id.*, pp. 19-20).  Those findings, along with

CAT scan results, indicated that her brain was critically injured and was in a near death situation.   (*Id*., p. 19).   The CAT scan revealed she had a "loss of gray white differentiation, which means significant brain injury and swelling, and she had a subdural hematoma . . . ."  (*Id*., pp. 20-21).  The doctor also noted severe retinal hemorrhages.  (*Id*., p. 21).   At the time of presentation and at the time of the PCR hearing, Dr. Theodorou's opinion was the same, abusive head trauma, which he explained was the changed terminology for what had previously been termed "shaken baby" or "shaken impact."  (*Id*., pp. 21-22).  The doctor was then questioned about the hemorrhages being iron positive and whether that had any impact on his opinion.  He stated that it was supportive of a finding of abusive trauma because "injuries of different ages is part of the pattern."  (*Id*., p. 23).

Dr. Theodorou was then asked about the views of the medical community about studies that suggest that a short fall could cause subdural hematomas and retinal hemorrhaging leading to death.  (*Id*., pp. 28-29).   Dr. Theodorou responded:

> There has been literature that I reviewed that I don't think changes the common medical knowledge that it can't.  In other words, there is literature and there's a case here and a case there, and there's the biomechanical literature that suggests that.  But it doesn't actually --- it's not strong enough.  I don't' think the articles are valid enough to change the opinion.

(*Id*., p. 29).  He went on the say that the "overall thinking as supported by the Academy of Pediatrics is it has not changed.  What has changed is to make sure we educate all our practitioners on understanding the pattern differences . . . ."  (*Id*.).  Finally, when asked if his opinion offered at trial had been changed based on the intervening studies, Dr.

Theodorou responded, "No."  (*Id.*, p. 30).

On cross-examination, Dr. Theodorou's adherence to his previous opinions was challenged on the basis of newer biomechanical and medical studies.   The doctor rebuffed the challenge, stating:

> So there are biomechanical engineers that feel the biomechanical studies you mentioned do not change the thinking because they are not robust enough.  They're not adequate to deal with biologic systems.
>
> So number one, the biomechanical stuff has not been validated, and biomechanical engineers themselves have said that that data is not good enough, because they don't take into account biologic variation.  The group out of Louisville, University of Louisville in Kentucky, have a very nice paper and I think they bring up the questions regarding, you know, biomechanical studies, number one.
>
> Number two, in terms of the Academy of Pediatrics recommendation, the reason why they want to change the nomenclature is that it could be shaking, it could be impact, it could be hypoxia.  They want to change the nomenclatura so nobody should feel limited that the name implies a mechanism.  So the change in name is for that reason.

(*Id.*, pp. 31-32).  At the close of Dr. Theodorou's testimony, the trial court judge sought to explore why some experts and practitioner's opinions had changed based on new studies and the doctor opined as follows:

> I reviewed the literature from both teaching and my work, there seems to be a small group of the same people that write much of the literature that is – that says there's a difference, and quite frankly, many times even in court, it's the same people that are testifying.
>
> So I guess just from my own observations, both in the literature and my personal experiences, it seems like there is a small group of people that feel that there's a difference.  But by far the bulk of the pediatric critical care neurosurgical community feel that the science is clear and it has not changed despite the change in terminology.

(*Id.*, p. 56).

1
2
3
4

## II.     Legal Discussion

### A.     Actual Innocence

The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."  *Schlup v. Delo*, 53 U.S. 298, 316 (1995); *see also McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013) ("Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . [or] expiration of the statute of limitations."); *Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011) ("a credible claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner who makes such a showing may pass through the *Schlup* gateway and have his otherwise time-barred claims heard on the merits.").

The "gateway" inquiry is whether "new facts raise [ ] sufficient doubt about guilt to undermine confidence in the result of trial."  *Schlup*, 53 U.S. at 317.  To establish a claim of actual innocence, a petitioner "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Id*. at 327.  "Actual innocence" is not supported by legal insufficiency, but means factual innocence.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).  The Supreme Court has

stated that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Schlup*, 513 U.S. at 321.

As summarized above, Petitioner has presented medical testimony and underlying studies which he contends entirely undermine the prosecution's theory, largely based on Dr. Theodorou's testimony, that Katherine Rose died as a result of SBS or SIS. Rather, he asserts, the new science upon which the presented evidence is based establishes that Katherine Rose died as the result of a short distance fall– just the sort of fall that the physicians testifying at trial said could not have caused her injuries. Petitioner contends that had this information been presented at trial, no reasonable juror could have found him guilty.

Recently, in *Gimenez v. Ochoa*, 821 F.3d 1136 (2016), the Ninth Circuit evaluated and rejected arguments that were remarkably similar to those offered by the Petitioner in this case. In *Gimenez*, the defendant, Alan Gimenez, had been convicted of murdering his infant daughter 20 years ago and argued, as Petitioner does here, that the expert evidence presented at the trial "has been undermined by subsequent scientific developments." *Id*. at 1138. The prosecution's theory at Gimenez's trial was that his daughter was a victim of SBS based on the diagnosis of the "triad" of subdural hematoma, brain swelling and retinal hemorrhage. *Id*. at 1143. In his habeas proceedings, Gimenez pointed to articles supporting his claim that medical knowledge about SBS had changed in the years since his conviction and argued that the diagnosis of triad of injuries no longer suffice to support a diagnosis of SBS. Rather, he contended, "the medical community requires evidence of impact injuries before diagnosing SBS,"

and because his daughter did not have head and neck injuries, "she couldn't have been a victim of SBS." *Id*. at 1142.  That evidence, Gimenez argued, established he was actually innocent and entitled to habeas relief. *Id*.

After recognizing that the introduction of flawed expert testimony at trial could undermine the fundamental fairness of a trial and support habeas relief, *id*. at 1145, the court analyzed Gimenez's actual innocence argument and the supporting evidence and quickly rejected it.  The court explained:

> Gimenez presented literature revealing not so much a repudiation of triad-only SBS, but a vigorous debate about its validity within the scientific community.  In 2006, one textbook acknowledged that "there is a dispute of whether inflicted subdural hematomas can occur from shaking alone."  In 2011, the triad theory of SBS was characterized merely as being under challenge. *See Cavazos v. Smith*, ⸺ U.S. ⸺, 132 S.Ct. 2, 10, 181 L.Ed.2d 311 (2011) (Ginsburg, J., dissenting) (commenting on the shift in scientific opinions about SBS). The debate continues to the present day. *See* Debbie Cenziper et al., *Shaken Science: Prosecutors Build Murder Cases on Disputed Shaken Baby Syndrome Diagnosis, Wash. Post* (Mar. 20, 2015),  https://www.washingtonpost.com/graphics/investigations/shaken-baby-syndrome/.

821 F.3d at 1145.  The court found that a juror considering the evidence as a whole "could still have concluded that [Gimenez's daughter] was shaken to death based on her numerous suspicious injuries, Gimenez's inconsistent statements about [her] torn frenulum and his admitted violent behavior." *Id*. As such, the court held that Gimenez had not presented evidence showing that no reasonable factfinder would have found him guilty. *Id*.

Guided by *Gimenez*, the Court finds that Petitioner has failed to establish his actual innocence.  The same debate recognized in *Gimenez* exists in this case.  At trial,

Dr. Theodorou testified that it was "impossible" that Katherine Rose's injuries were the result of a minor fall.  Dr. Thiersch and Dr. Schroeder agreed and all three doctors believed that her injuries involved a significant impact and not merely shaking.  Then, during the most recent PCR proceedings, Petitioner advanced the LMF theory and Dr. Stephens opined that Katherine Rose "died as a result of a short-distance fall from her bed onto a carpeted floor which resulted in the onset of global brain swelling and subdural hemorrhage."  Despite that testimony, Dr. Theodorou's opinion was unchanged between the trial and the PCR hearing, going so far as to state that his "own observations, both in the literature and my personal experiences, it seems like there is a small group of people that feel that there's a difference.  But by far the bulk of the pediatric critical care neurosurgical community feel that the science is clear and it has not changed despite the change in terminology."  Thus, as was the case in Gimenez, this case "presents a battle between experts who have different opinions . . . ," that is characteristic of standard litigation.  *Gimenez*, 821 F.3d at 1143.

What is also similar to *Gimenez* is the presence of non-expert testimony that is damning in Petitioner's case.  Petitioner's experts' testimony does not undermine testimony that established that Katherine Rose was at least twice found unconscious after being alone with Petitioner, or that Petitioner admitted to tossing her into a chair, or that Katherine Rose by all accounts appeared "sick" for days before she was taken to the hospital.  It also does not affect the testimony that Petitioner initially refused to take her to the hospital, said "we'll all go down for this," and told Joshua what to tell authorities. It also does not explain away Joshua's testimony that Petitioner later told him to assign

blame Fernane, or Lawrence Stern's testimony that he heard Petitioner tell Joshua that he should "stick to the story."

Thus, in light of the consistent and unyielding testimony offered by Dr. Theodorou at trial and at the PCR proceedings and the significant and unchallenged non-expert testimony offered at trial, Petitioner has not persuaded the Court that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.  As such, Petitioner fails to "pass through the [actual innocence] gateway" and his claims are precluded as untimely.

**B.     New Evidence and Felony Murder**

In addressing the Petition, the Court leapfrogged Respondents' threshold argument that Petitioner's conviction for felony murder is unaffected by the new evidence and thus precludes relief.  For the sake of completeness, the Court now turns to that contention and finds that, contrary to Respondents' contentions, if relief were warranted at all based the new evidence, Petitioner would also be entitled to relief on the felony murder conviction. This is because the record reflects that the child abuse count of knowingly or intentionally causing Katherine Rose's injuries was the predicate felony for the murder count.  Doc. 24, Exhibit B, at 3.  Thus, if the new evidence was found to support the claim of actual innocence, the conviction on the predicate felony would be called into doubt and could not be used to support the murder conviction.

**III.     Recommendation**

For all of the above reasons, the Magistrate Judge recommends that the District Court, after its independent review, issue an Order **denying** Petitioner's Petition for Writ

of Habeas Corpus filed January 17, 2006 (Doc. 1).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10) days within which to file a response to the objections. No reply briefs are permitted without leave of the District Court.  If any objections are filed, this action should be designated case number: **CV 06-0016-TUC-DCB**.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues.  *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

Dated this 2nd day of August, 2016.

_____
Honorable Jacqueline M. Rateau
United States Magistrate Judge