IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Guy Stern,<br><br>         Petitioner,<br><br>v.<br><br>Dora B Schriro, et al.,<br><br>         Respondents. | No. CV-06-00016-TUC-DCB<br><br>**ORDER** |

      This matter was referred to Magistrate Judge Jacqueline M. Rateau on August 19, 2015, pursuant to the Rules of Practice for the United States District Court, District of Arizona (Local Rules), Rule (Civil) 72.1(a). On August 2, 2016, Magistrate Judge Rateau issued a Report and Recommendation (R&R). She recommends that the Court dismiss the Petition with prejudice. Subsequent to the Magistrate Judge issuing her R&R, the Petitioner filed *pro se* "emergency" motions seeking the withdrawal of his attorney and leave to file additional material in support of his Petition. Petitioner has been, represented by counsel through the duration of this case in this court, in the court of appeals, and in the state court subsequent to its remand and stay here to exhaust his claims there.

      This Court appointed Brick Storts to serve as counsel for Petitioner on January 24, 2007, because Mr. Storts had represented him in his second Post-Conviction Petition and had done a good job. There is nothing in the record to suggest that Mr. Storts has not

continued to do a good job representing the Petitioner,[1] except for Petitioner's complaints about trial strategies during the evidentiary hearing held in the state court.  Petitioner accuses Mr. Stort's of knowingly suppressing material/exculpatory evidence when he refused to ask questions at the evidentiary hearing in the state proceeding, and therefore failed to establish that medical science related to "shaken-baby syndrome (SBS)" has changed.  Petitioner also complains that his attorney, unbeknownst to him, entered into a false stipulation that the state evidentiary hearing was "a sufficient record for review, and the Petitioner received a full and fair hearing."  (Status Report (Doc. 187) at 2.)

The evidentiary hearing was held May 21, 2012.  Mr. Storts was persuasive on the question of new evidence. Petitioner attended the evidentiary hearing and, therefore, has known its alleged deficiencies since then.  The Status Report was filed on April 14, 2014.  Counsel for Petitioner would have kept him informed regarding the status of the case and consulted him about the means for obtaining his objectives.  Arizona Rules of Professional Conduct, ER 1.4.  The Court also notes that Petitioner would have received a copy of the Reply filed September 8, 2014, to the Response to the Supplemental Memorandum on Actual Innocence in Support of the Petition and a copy of the Supplemental Memorandum filed June 11, 2014.  Both of these documents reflect the reliance in this case on the evidentiary record presented at the hearing in state court.

The Court finds no explanation for why Petitioner waited until the Magistrate Judge issued the R&R on August 2, 2016, to complain about his attorney's performance in regard to these two matters—except perhaps because the R&R was unfavorable.  The R&R is fully briefed and ready for disposition by the Court.   Pursuant to the recommendation of the Magistrate Judge, the ruling on the R&R, not a trial, will resolve this case.  Petitioner's motion to proceed pro se and to further brief his petition is untimely.  *Cf.,* LRCiv.83.3(b)(3) (no permission to withdraw after an action is set for trial, unless new attorney is, or client has made arrangement to be, prepared for trial).

---

[1] The state court, hearing the PCR, commended "both parties for a well pleaded and argued case."  (State Response, Ex. AA: AZ Superior Court Ruling (Doc. 192-1) at 11.)

Before the Court will allow counsel to withdraw, it considers: (1) the reasons why withdrawal is sought; (2) the prejudice withdrawal may cause to other litigants; (3) the harm withdrawal might cause to the administration of justice; and (4) the degree to which withdrawal will delay the resolution of the case. *Beard v. Shuttermart of Cal., Inc*., 2008 WL 410694, at *2 (S.D. Cal. Feb. 13, 2008). Clearly granting Petitioner's emergency motions would delay resolution of the case and be highly prejudicial to the State. If the Court were to grant Petitioner's emergency motions, it would effectively reboot the case to its post-remand status. The Court finds there is no good cause to delay the administration of justice in this case.

The Court will deny Petitioner's emergency motions. The Court accepts and adopts the Magistrate Judge's R&R as the findings of fact and conclusions of law of this Court and dismisses the Petition, with prejudice. Petitioner may proceed pro se on appeal in the event he files an appeal from this Order. The Court withdraws Brick Storts as counsel of record in this case; Petitioner is returned to pro se status.

### STANDARD OF REVIEW

The duties of the district court in connection with a R&R by a Magistrate Judge are set forth in Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1). Where the parties object to an R&R, "'[a] judge of the [district] court shall make a *de novo* determination of those portions of the [R&R] to which objection is made.'" *Thomas v. Arn*, 474 U.S. 140, 149-50 (1985) (quoting 28 U.S.C. § 636(b)(1)).

This Court's ruling is a *de novo* determination as to those portions of the R&R to which there are objections. 28 U.S.C. § 636(b)(1)(C); *Wang v. Masaitis*, 416 F.3d 992, 1000 n. 13 (9th Cir.2005); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121-22 (9th Cir.2003) (*en banc*). To the extent that no objection has been made, arguments to the contrary have been waived. Fed. R. Civ. P. 72; see 28 U.S.C. § 636(b)(1) (objections are

waived if they are not filed within fourteen days of service of the R&R), *see also McCall v. Andrus*, 628 F.2d 1185, 1187 (9th Cir. 1980) (failure to object to Magistrate's report waives right to do so on appeal); Advisory Committee Notes to Fed. R. Civ. P. 72 (citing *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974) (when no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation)).

The parties were sent copies of the R&R and instructed that, pursuant to 28 U.S.C. § 636(b)(1), they had 10 days to file written objections. *See also*, Fed. R. Civ. P. 72 (party objecting to the recommended disposition has fourteen (14) days to file specific, written objections). The Court has considered the objections filed by the Petitioner, and the parties' briefs considered by the Magistrate Judge in deciding whether or not to dismiss the Petition.

## OBJECTIONS

The Petitioner objects to the Magistrate Judge's finding that he has not established his actual innocence because this case is not like *Gimenez v. Ochoa,* 821 F.3d 1136 (2016), where alleged new evidence was essentially just different opinions among experts, with other evidence in the record from which a reasonable juror could still conclude he was guilty of murder. Petitioner argues that the Magistrate Judge erroneously looked at whether sufficient evidence still existed in light of the new medical evidence when she should have considered how reasonable jurors would react to the overall evidence, including the new medical evidence, to find reasonable doubt or not.

The Court agrees *Gimenez* is distinguishable, but nevertheless helpful as a guide for how to look at the totality of the evidence in the context of a claim of actual innocence based on changes in scientific knowledge. *Gimenez* considered as a matter of first impression whether new evidence surrounding SBS supports habeas relief under 2244(b)(2)(B)(ii) for a petitioner who is actually innocent of any crime. *Id.* at 1145 (noting that in *Cavazos v. Smith,* 132 S. Ct 2 (2012) (Ginsburg, J., dissenting) (characterizing the shift in scientific opinions about SBS as being under challenge, not as

changed).

"The Supreme Court has never recognized 'actual innocence' as a constitutional error that would provide grounds for relief without an independent constitutional violation." *Gimenez,* 821 F.3d at 1143.  In *Gimenez,* the Ninth Circuit joined the "[t]hird [c]ircuit in recognizing that habeas petitioners can allege a constitutional [due process] violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence 'undermined the fundamental fairness of the entire trial.'" *Id.* at 1145 (quoting *Lee v. Glunt,* 667 F.3d 397, 167 (3rd Cir. 2012) (relying on *Murry v. Carrier,* 477 U.S. 478, 494 (1986)).  The trial must have been "'so extremely unfair that it [] . . . violate[d] fundamental conceptions of justice.'"  *Id.* (quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990)).

In *Gimenez*, the court examined the evidence as a whole, 28 U.S.C. § 2244(b)(2)(B)(ii); *Jones v. Ryan*, 733 F.3d 825, 845 (9th Cir.2013), and concluded Gimenez could not prove by "clear and convincing evidence" that "no reasonable factfinder" would have found him guilty but for the introduction of purportedly flawed SBS testimony, 28 U.S.C. § 2244(b)(2)(B)(ii); *Gage v. Chappell*, 793 F.3d 1159, 1168 (9th Cir.2015). "A juror could still have concluded that Priscilla was shaken to death based on her numerous suspicious injuries, Gimenez' inconsistent statements about Priscilla's torn frenulum and his admitted violent behavior. Even assuming the prosecution's experts couldn't testify that the triad alone establishes SBS, the evidence Gimenez presents isn't enough to show by clear and convincing evidence that "no reasonable factfinder" would have found him guilty." *Gimenez,* 821 F.3d at 1145 (citing *Jones*, 733 F.3d at 845; *Gage*, 793 F.3d at 1168).

The posture of Stern's case is distinguishable.  After the Ninth Circuit Court of appeals, *en banc*, held that a valid claim of actual innocence can act as a gateway to excuse an untimely filed habeas petition, *Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011) (applying *Schlup v. Delo*, 513 U.S. 298 (1995), the appellate court remanded Stern's case

to determine whether the untimeliness of his Petition "is excused based on his assertion of actual innocence due to newly discovered medical evidence invalidating the prosecution's theory of shaken baby syndrome or shaken impact syndrome." (Mandate, Order (Doc. 175-1) at 1-2.) After remand, the matter was stayed pending the Petitioner's exhaustion of this argument, which Petitioner had in the interim presented pursuant to a fourth petition for Post-Conviction Relief (PCR), in the Arizona state courts.  Rule 32.1(e)(1) (arguing newly discovered scientific evidence established "that shaken baby syndrome (SBS) and thick-cushion shaken impact syndrome (SIS) could never cause traumatic brain injury, but a lethal minor fall (LMF) could").  (R&R (Doc. 198) (citing State Response, Ex. AA: AZ Superior Court Ruling (Doc. 192-1) at 3 (relying on Ex. FF: Stern's Legal Memorandum)).  After an evidentiary hearing, the state court denied the PCR Petition.

To obtain a new trial under Rule 32, Stern had to establish that the newly discovered evidence is credible and also that the jury, considering all the other evidence presented at the trial and the newly discovered evidence, probably would have resulted in the acquittal of the accused if it had been produced at the trial.  (State Response, Ex. AA: AZ Superior Court Ruling (Doc. 192-1) at 10 (citing *State v. Serna,* 807 P.2d 1109, 1111 (Ariz. 1991) (en banc); *State v. Turner*, 455 P.2d 443, 445-46 (1969)).

The trial court found the newly discovered evidence was credible, but would not result in an acquittal because it did not entirely dispel the old expert evidence, "and more importantly, because the State [] presented significant non-medical evidence from which the jury could find that Defendant intentionally hurt K.F. on the two occasions that she passed out." *Id.*  The court found the newly discovered evidence probably would not have changed the jury verdict.  The Arizona Court of Appeals affirmed the trial court's ruling; the Arizona Supreme Court denied review.

Subsequently, this Court lifted the previously entered stay.  The parties agreed to proceed on the basis of the state evidentiary hearing with supplemental briefing on Petitioner's actual innocence gateway-exception claim.   On August 2, 2016, the

1  Magistrate Judge issued the R&R.  On August 12, 2016, the Petitioner filed his
2  Objection.  The matter is ready for adjudication by this Court.

### THE R&R: ACTUAL INNOCENCE GATEWAY CLAIM

The Magistrate Judge did not apply the wrong standard of review; she did not, as Stern asserts, determine "whether sufficient evidence still exists to support a determination of guilt beyond a reasonable doubt."  (Objection (Doc. 200) at 4.)  This Court is clear that "the gateway actual-innocence standard is 'by no means equivalent to the standard of *Jackson v. Virginia,* 443 U.S. 307 . . . (1979)," which governs claims of insufficient evidence and looks at whether there is sufficient evidence to support the verdict.  *House v. Bell,* 547 U.S. 518, 538 (2006).  Like the Petitioner, this Court looks to *House,* which like this case was a *Schlup* inquiry, based on a fully developed record.  *Id.* at 538.  There the Court emphasized several *Schlup* standards, which this Court repeats here.

First, the Court finds that by conceding to rely on the evidentiary record presented in the state PCR hearing, there is no dispute that Stern has presented credible new evidence.  In reviewing the merits of the *Schlup* inquiry, this Court considers "'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'" *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 327–328 (further quotation omitted).  "Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 538 (citing *Schlup,* 513 U.S. at 329).  In other words, the court does not make an independent factual determination about what likely occurred, but rather assesses the likely impact of the evidence on reasonable jurors. *Id.*

As the Court in *House* did, this Court finds "it bears repeating that the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *Id.* (quoting *Schlup*, 513 U.S. at 327 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) and *see also Schlup*, 513 U.S. at 324 (emphasizing that "in the vast majority of cases, claims of

- 7 -

1    actual innocence are rarely successful")). At the gateway stage, the *Schlup* standard does
2    not require absolute certainty about the petitioner's guilt or innocence, but Petitioner must
3    "demonstrate that more likely than not, in light of the new evidence, no reasonable juror
4    would find him guilty beyond a reasonable doubt—or, to remove the double negative,
5    that more likely than not any reasonable juror would have reasonable doubt." *Id.*

6    Put another way, *Schlup* is not a trial do-over. *Lee v. Lampert,* 653 F.3d 929, 946
7    (9th Cir. 2011) (Kozinski concurring). To pass through the *Schlup* actual-innocence
8    gateway, Petitioner must persuade this Court that, "more likely than not," "every juror
9    would have voted to acquit him." *Id.*

10   After a *de novo* review of the record, this Court finds that Stern's conviction was
11   based on testimony by experts that K.F. died due to abusive head trauma, which at the
12   time of the trial was referred to as SBS or SIS.  While the medical terminology has
13   changed, the Court finds that SBS does not, and never did, apply in this case because it is
14   a syndrome found in infants, (TR 3 (Doc. 42-5) at 192-193), and K.F. was two years old.
15   Petitioner's expert was wrong in understanding that SBS was the basis for Stern's
16   conviction.  (R&R at 14 (PCR EH (Doc. 192-3) at 125-126.)  The trial testimony was at
17   all times, by all experts, that K.F. died from head trauma.  *See e.g.*, R&R at 10 (TR 3
18   (Doc. 42-5) at 173-174, 187 (Dr. Thiersch describing injuries as blunt force trauma and
19   blunt impact to her head); R&R at 12 (TR 3 (Doc. 42-5) at 206, 208 (Dr. Schroeder
20   describing significant injuries caused by significant trauma and caused by an
21   acceleration/deceleration injury on the magnitude of an auto accident without a seat belt).

22   According to Petitioner's expert Hanna, SIS is a misnomer because it is the impact
23   that produces the damage, not the shaking.  (PCR EH (Doc. 192-2) at 13.)  The correct
24   term now according to the American Academy of Pediatrics is abusive head trauma.  *Id.*
25   at 71.  He stated that in terms of SIS not much has changed in respect to the science
26   surrounding head trauma caused from hitting the head on a hard surface, where there is
27   some kind of external injury. *Id.* at 60-61.

28

1    Dr. Theodorou, the pediatrician who treated K.F. at the hospital after her injury
2  testified at the PCR evidentiary hearing that his opinion at the time of trial was abusive
3  head trauma, and it remained the same: "K.F.'s injuries were consistent with inflicted
4  rather than accidental trauma."  (State Response, Ex. AA: AZ Superior Court Ruling
5  (Doc. 192-1) at 5.)  At the trial, Dr. Thiersch described two impact injuries to her head
6  area one on top of her head and one in her forehead, with the most recent blunt force
7  injury probably being the direct cause of death. (TR 4 (Doc. 42-6) at 68, 190 (Doc. 42-
8  7)).  The Court finds there is new terminology, but no new evidence in respect to abusive
9  head trauma like the type that occurred here.

10    There is, however, new medical evidence regarding lethal minor falls (LMF).
11  Petitioner's expert, Patrick Hannon, Ed. D, a biomechanics expert, testified about SBS,
12  SIS and LMF, generally.  "He did not examine the specifics of this particular case."
13  (PCR EH (Doc. 192-2) at 14.)

14    He explained it is now believed that minor falls from low heights of just a couple
15  of feet, like a bed or couch, can be lethal.  He explained that in addition to the importance
16  of the height of the fall, it is also important whether the surface is carpeted or wood or
17  concrete.  Equally or maybe more important is the position of the body, especially if the
18  child falls head first because of loading, meaning the weight of the child's body increases
19  the force of the fall, *id.* at 29-32, 36, 42, 46, 50-54, 74-78, and has a pile-driver effect,
20  (PCR EH (Doc. 192-3) at 96.  Tip-over falls increase the velocity of the fall.  *Id.* at 98-99.
21  The likelihood of a LMF is one in a million as compared to the likelihood of death from a
22  peanut allergy which is one in two million, (PCR EH (Doc. 192-2) at 56-57), but he
23  admitted that in the context of short falls it is "very unlikely" that it will be lethal, (PCR
24  EH (Doc. 192-3) at 109), because you have to have a head tip-over fall and most short
25  falls involve a fall to the buttocks or shoulder and the hands come out to break the fall, *id.*
26  at 109-110. In respect to suffering head trauma from being slammed into a cushioned
27  chair or couch, he testified that it would not be possible because the chair back or cushion
28  would absorb the momentum—"no possibility for brain injury, period." (PCR EH (Doc.

1 192-2) at 57-58, (PCR EH (Doc. 192-3) at 106-108). Except for referencing that in one
2 of the two LMF studies, the child had lived for a period of time until the morning of the
3 following night the child was found dead, (PCR EH (Doc. 192-2) at 36), Hannon did not
4 address Petitioner's other new medical evidence: that following a head trauma the child
5 could have a lucid period where she acted normally.

6 For that evidence, the Court turns to Petitioner's expert Dr. Stephens, a
7 pathologist, board certified in forensic pathology. (PCR EH (Doc. 192-3) at 120). He
8 did review the Petitioner's case, *id.* at 126, and testified that to a medical certainty he
9 believed K.F. "died as a result of a short-distance fall from her bed onto a carpeted floor
10 which resulted in the onset of global brain swelling and subdural hemorrhage." *Id.* at
11 127. He testified that by definition SBS would not apply because K.F. had evidence of
12 impact in her head, a history of apparent head impacts on probably more than one
13 occasion, including a car accident, and of course she was too old to be a victim of SBS.
14 *Id.* at 128-129. According to Dr. Stephens, the brain changes in K.F. were anywhere
15 from a day or two—or three days up to probably two weeks. *Id.* at 132. He admits that
16 aging and dating subdural hematomas based on microscopic examination or any medical
17 finding is extremely difficult and in most situations you cannot get closer than 24 to 48
18 hours and be absolutely reliable. *Id.* Instead, like the doctors who testified at Stern's
19 trial, he looked at the iron positivity. *Id.* at 132. Again like the trial doctors, he testified
20 that iron is seen in the brain at a minimum of 72 hours, but he added that not much is
21 seen before five days. *Id.* at 133. He reported that if there were two or three impacts
22 within some say up to a year, there is a tendency for the brain to swell harder and faster
23 than it would with just only one single attack. (PCR EH (Doc. 192-4) at 140). He
24 explained that in a study of 160 cases of infant death, about 75 % developed their
25 symptoms within 24 hours of being brought to the emergency room in critical condition,
26 but 25% took up to three or four days to develop symptoms. *Id.* at 143-144. He noted
27 that studies reflect brain swelling may occur within as little as 20 to 30 minutes of the
28 injury or it may take up to 72 hours, and we don't know in any given case which of those

1 two events is happening. *Id.* at 145.  He rejected the idea that any injury could have been
2 caused from being thrown into the cushioned living room chair, and opined the injury
3 was more likely the result of K.F.'s fall onto the carpet covered concrete floor.  *Id.* at
4 148-149.

5    On cross-examination Dr. Stephens agreed that at trial the testimony reflected the
6 top of the scalp showed positive for intracellular iron, which was consistent with his
7 opinion of an older, five-day, lesion and the scalp frontal reflected no intercellular iron
8 where the forehead was bruised and no iron at the bruise at the back of the head. *Id.* at
9 169.  He believed the fatal head injury was caused by an accident based on a history of no
10 inflicted injury.  *Id.* at 176.

11    At the PCR evidentiary hearing, Dr. Theodorou, MD, the treating physician who
12 testified at Stern's trial, responded to Petitioner's experts.  Dr. Theodorou explained that
13 you look for a pattern of an abusive head trauma.  (PCR EH (Doc. 192-6) at 15.)  When
14 you have the SBS triad, which is a constellation of injury with subdural hematoma,
15 retinal hemorrhages, severe brain injury, and which existed here, and there is no history
16 to explain the injuries—then you look for other diagnoses that might explain the
17 symptoms or constellation of injury—which includes apnea, bruising especially on the
18 face and neck, and injuries of different ages.  *Id.* at 17.)  The more of these other findings
19 you have, the more likely that the pattern will represent abusive head trauma.  *Id.*  Here,
20 there were all these findings, plus when the autopsy was done it revealed subgaleal
21 hemorrhages, i.e., impact points corresponding to the bruising.  *Id.* at 22.   In his opinion,
22 short falls do not cause these types of injuries, *id.* at 29, and that even a headfirst fall off a
23 bed would not have caused the type of injury seen in K.F., *id.* at 38-30.  The type of
24 injury seen in K.F.'s brain required significant force, which would be equivalent to being
25 dropped from 10 to 20 feet high.  *Id.* 38.  He agreed with Petitioner's experts, and it was
26 his testimony at trial, that being thrown into the cushioned living room chair would not
27 have caused K.F.'s injury.  (TR (Doc. 42-9) at 103.)

28

1    Dr. Theodorou explained that a lucid interval, where the patient is okay and then
2 starts to deteriorate neurologically occurs in short distance falls, *id.* at 12, but not in an
3 injury with a subdural hematoma because then the mechanism of injury has caused injury
4 to the brain itself, not just to a blood vessel causing bleeding, *id.* at 13.  If there is an
5 injury to the brain proper, you are altered from the onset. *Id.* As the brain swells from the
6 injury, the consequences progress, getting worse, and it would not be typical to be okay
7 and then deteriorate.  *Id.* at 14.

8    Dr. Theodorou did not agree with the "sea of change" testimony from Petitioner's
9 experts.  He explained that changes have occurred in the terminology but not the overall
10 thinking.  The change is to make sure that practitioners understand the pattern differences
11 between accident and abusive head injury.  *Id.* at 21, 29.

12    Here, in his opinion the pattern reflected then and now: abusive head trauma. *Id.*

13    Because the Court finds that the only relevant new science is in the area of short
14 falls, the Court must consider the evidence in this case which would support a jury
15 finding that K.F. was injured by a short fall.

16    Joshua, Stern's 17-year old teenage son, lived with Stern and Michelle Fernane,
17 K.F.'s mother.  The Court begins with his testimony regarding the day K.F. was taken to
18 the hospital on Sunday, November 14, 1993.

19    Joshua and Michelle came home from the grocery store around mid-morning, to
20 find Stern, who had been left alone with K.F., in the living room giving mouth-to-mouth
21 resuscitation to K.F., who was unconscious.  After Stern and Michele continued
22 unsuccessfully to try to revive her, Joshua finally said he was going to take her to the
23 hospital.  (TR (Doc. 42-7) at 206- 213.)  Stern told Joshua and Michele to tell the hospital
24 "that she fell from the bed and got knocked out."  *Id.* at 214.

25    At the hospital, K.F. presented on the verge of death, with apnea requiring a
26 breathing tube because there was minimal brain function, dilated pupils, slow heart rate
27 because her body was shutting down. (PCR EH (Doc. 192-6) at 19.)  She would die the
28 next day.  Working backwards, the Court assesses whether the new evidence about LMF

would "more likely than not" cause each juror, considering all the evidence then and now, to find there was reasonable doubt and acquit Stern.

Joshua testified that on weekends, he usually watched the kids, including K.F., because he was around. On the Friday before K.F. died, his uncle, Stern's brother, came over and he and Stern went out, leaving Joshua to watch the kids because Michelle was getting her hair done. Joshua described K.F. as acting sick on Friday. And on Saturday, he had the kids outside playing and K.F. was acting sick. *Id.* at 201-202. She would just sit there, wherever he sat her down. (TR (Doc. 42-7) at 203.) By Sunday morning, she just kept laying down and falling asleep. *Id.* at 205. Mid-morning, she was taken to the hospital near death.

Joshua testified that on Friday, "definitely a different Friday," *id.* at 201, he walked into the living room where he found Stern administering mouth-to-mouth resuscitation. Stern and K.F. had been alone in the living room, and Stern told Joshua that he had "tossed" K.F. into a cushioned living room chair and she passed out. Stern asked Joshua to help him revive her by sprinkling cold water on her face. Stern told Joshua to not tell anyone what had happened. Joshua testified that K.F. began acting sick after this incident. *Id.* at 197-201.

Joshua testified that about a week before that, K.F. fell off of Joshua's bed, but she seemed fine after that. *Id.* at 194-197.

The evidence reflects that K.F. fell off Joshua's bed 12 to 14 days prior to her death, and she seemed fine after her fall. She was knocked unconscious by Stern 8 days prior to her death, and began exhibiting symptoms of deterioration. She was found unconscious while alone with Stern again on the day she was taken nearly dead to the hospital. The new LMF evidence is that some short falls, in extremely rare circumstances, can result in periods of lucidity which are generally 24 hours but can be up to 72 hours, and then ultimately result in death. There is no credible evidence in the record that there was any short fall within 72 hours prior to K.F.'s being taken to the hospital on November 13, 1993, on the verge of death.

1     The lucid period, here, was approximately two weeks before K.F. presented near death at the hospital, and the period of deterioration lasted approximately eight days. Neither of these scenarios fits within the confines of Petitioner's expert witnesses' testimony for lucid intervals.

    This case is like *Gimenez* because there is additional "damning" non-expert testimony supporting the conclusion of guilt. (R&R (Doc. 198) at 22.) K.F. had numerous suspicious blunt-force injuries to her brain, which were of different ages. *Supra.* "The state presented evidence that Defendant was a verbally and physically abusive parent." (State Response, Ex. AA: AZ Superior Court Ruling (Doc. 192-1) at 2-3 (citing trial testimony)). The testimony reflected that Stern told several different accounts of how K.F. was injured, i*d.* at 3, and told Joshua to tell authorities different untrue accounts of what happened, *Id.* at 4, including that she fell off the bed. *Supra.* Stern was the only person with K.F. both time she was found unconscious. *Supra.* Finally, the testimony reflected Stern did not want to take K.F. to the hospital. (State Response, Ex. AA: AZ Superior Court Ruling (Doc. 192-1) at 2-3 (citing trial testimony)). *Id.* at 3.

## CONCLUSION

    After de novo review of the issues raised in Petitioner's Objections, this Court agrees with the recommendation of the Magistrate Judge in her R&R to dismiss this Petition, with prejudice. The Court finds that more probably than not in light of all the evidence, including the new LMF evidence, no reasonable juror would have reasonable doubt about Stern's guilt. This Court is not persuaded that every juror would have voted to acquit him based on this new evidence. The Court finds that Stern does not pass

/////
/////
/////
/////
/////

through the actual-innocence gateway to excuse his late filed Petition. Stern cannot avoid dismissal of his Petition..

**Accordingly**,

**IT IS ORDERED** that after a full and independent review of the record, in respect to the objections, the Magistrate Judge's Report and Recommendation is accepted and adopted as the findings of fact and conclusions of law of this Court.

**IT IS FURTHER ORDERED** that the Petition is time barred by the AEDPA statute of limitations, 28 U.S.C. § 2254(d)(1), and dismissed with prejudice.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment accordingly.

**IT IS FURTHER ORDERED** that the Motion for Extension of Time to File Objection is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that the Petitioner's two emergency motions (Doc. 201, 202) are DENIED.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall remove Brick Storts as counsel of record for Petitioner and let the docket reflect that Petitioner is now proceeding pro se.

**IT IS FURTHER ORDERED** that in the event Petitioner files an appeal, he may proceed *in forma pauperis* and the Court grants a certificate of appealability. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Dated this 20th day of September, 2016.

Honorable David C. Bury
United States District Judge